UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2025 DEC 11 PM 3: 36

CLERK

BY_____
DEPUTY CLERK

ENAYETULLAH WALIZADA,                        )
                                             )
        Petitioner,                          )
                                             )
        v.                                   )        Case No. 2:25-cv-00768
                                             )
DONALD J. TRUMP, in his official capacity    )
as President of the United States; PATRICIA  )
HYDE, in her official capacity as Acting     )
Boston Field Office Director, U.S. Immigration )
and Customs Enforcement; DAVID W.            )
JOHNSTON, in his official capacity as        )
Vermont Sub-Office Director of U.S.          )
Immigration and Customs Enforcement,         )
Enforcement and Removal Operations; TODD     )
M. LYONS, in his official capacity as Acting )
Director, U.S. Immigration and Customs       )
Enforcement; PETE R. FLORES, in his official )
capacity as Acting Commissioner of U.S.      )
Customs and Border Protection; KRISTI        )
NOEM, in her official capacity as Secretary of )
the U.S. Department of Homeland Security;    )
MARCO RUBIO, in his official capacity as     )
Secretary of State; PAMELA BONDI, in her     )
official capacity as United States Attorney  )
General; GREG HALE, in his official capacity )
as Superintendent of the Northwest State     )
Correctional Facility in St. Albans, Vermont, )
                                             )
        Respondents.                         )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
PETITION FOR WRIT OF HABEAS CORPUS**
(Doc. 1)

On September 16, 2025, Petitioner Enayetullah Walizada filed this petition for writ

of habeas corpus pursuant to 28 U.S.C. § 2241 (the "Petition"), challenging the

lawfulness of his detention by U.S. Immigration and Customs Enforcement ("ICE")

under the Fifth Amendment Due Process Clause and the Fourth Amendment and seeking immediate release from ICE custody. (Doc. 1.) Named as respondents are Donald J. Trump, in his official capacity as President of the United States; Patricia Hyde, in her official capacity as Acting Boston Field Office Director of ICE; David W. Johnston, in his official capacity as Vermont Sub-Office Director of ICE Enforcement and Removal Operations; Todd M. Lyons, in his official capacity as Acting Director of ICE; Pete R. Flores, in his official capacity as Acting Commissioner of U.S. Customs and Border Protection ("CBP"); Kristi Noem, in her official capacity as Secretary of the U.S. Department of Homeland Security ("DHS"); Marco Rubio, in his official capacity as Secretary of State; Pamela Bondi, in her official capacity as United States Attorney General (collectively the "Federal Respondents"); as well as Greg Hale, in his official capacity as Superintendent of the Northwest State Correctional Facility in St. Albans, Vermont.[1]

On September 16, 2025, Mr. Walizada filed an emergency motion for a temporary restraining order ("TRO") asking the court to enjoin his removal from the District of Vermont by the Federal Respondents and Mr. Hale pending the adjudication of his habeas petition. On September 17, 2025, the court granted the TRO, (Doc. 6), and ordered Federal Respondents and Mr. Hale to show cause "on or before September 24, 2025, why a writ of habeas corpus should not be granted[,]" pursuant to 28 U.S.C. § 2243.[2] (Doc. 7 at 2.) Federal Respondents filed their response on September 24, 2025, (Doc. 9), and Mr.

---

[1] Mr. Hale "does not concede that he has been properly served with any filing in this matter. The Vermont Attorney General's Office has not been served with a copy of the Petition; on PACER, Vermont Assistant Attorneys General cannot access the Petition or Counsel's Notice of Appearance." (Doc. 10 at 1-2, n.1.) In his role as Superintendent of the Northwest State Correctional Facility, Mr. Hale confirmed that Mr. Walizada was detained at the facility at the time of the filing of the Petition, but denies that he has any "authority over transfer decisions of federally detained individuals." *Id.* at 2, ¶ 7. He "takes no position on the substance of the Petition." *Id.* at 3, ¶ 8.

[2] "A court, justice[,] or judge entertaining an application for a writ of habeas corpus shall forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled thereto." 28 U.S.C. § 2243.

Hale filed his limited response on September 26, 2025. (Doc. 10.) Mr. Walizada replied
on September 30, 2025. (Doc. 12.) The court extended the TRO on October 1, 2025,
(Doc. 13), and held a hearing on October 7, 2025, at which the court granted Mr.
Walizada leave to file supplemental briefing and declined to further extend the TRO. Mr.
Walizada submitted his supplemental brief on October 21, 2025. (Doc. 17.) On
November 4, 2025, Federal Respondents responded, (Doc. 19), at which time the court
took the Petition under advisement.

　　　Mr. Walizada is represented by Nathan J. Virag, Esq. Federal Respondents are
represented by Assistant United States Attorney Matthew J. Greer. Mr. Hale is
represented by Assistant Attorney General for the State of Vermont Debbie H. Stevens,
Esq.

## I.　　Factual and Procedural Background.

　　　In August 2021, the United States concluded its twenty-year war in Afghanistan
and with the Taliban, evacuating over 120,000 people from Kabul over two weeks,
approximately 70,000 of whom were Afghans. As part of the withdrawal from
Afghanistan, DHS initiated "Operation Allies Welcome," under which the United States
government helped "vulnerable Afghans, including those who worked alongside [the
United States] in Afghanistan for the [previous] two decades, . . . safely resettle in the
United States." *Operation Allies Welcome*, DEP'T OF HOMELAND SEC.,
https://www.dhs.gov/archive/operation-allies-welcome (last updated Jan. 22, 2025).[3]
DHS coordinated a broad range of services, including initial processing and connecting
evacuees with non-governmental organizations for resettlement into communities.

　　　Afghans who entered the United States pursuant to "Operation Allies Welcome"
were subjected to extensive security screening and vetting "to ensure that those seeking
entry do not pose a national security or public safety risk" and to conform with the

---

[3] "A court may take routine judicial notice of documents retrieved from official government
websites." *Vill. Green At Sayville, LLC v. Town of Islip*, 43 F.4th 287, 299 n.7 (2d Cir. 2022)
(alternations adopted) (internal quotation marks and citations omitted). The court takes judicial
notice of this website as an official public record pursuant to Fed. R. Evid. 201.

3

operation's "dual goals of protecting national security and providing protection for our Afghan allies." *Id.* The initial processing involved "biometric and biographic screenings conducted by [multiple] intelligence, law enforcement, and counterterrorism" agencies and "reviewing fingerprints, photos, and other biometric and biographic data for every single Afghan before they [were] cleared to travel to the United States." *Id.* Afghans subsequently underwent a primary inspection upon arrival in the United States and, if required, a secondary inspection.

"Certain Afghan individuals [were] granted humanitarian parole by [DHS], in response to their need for rapid evacuation and relocation[.]" *Id.* "[P]arole [was] only issued subsequent to required screening and vetting." *Id.* To facilitate the resettlement of Afghans granted humanitarian parole, DHS waived filing fees and streamlined the application process for work authorization, adjustment of status, and other services. As articulated by then Secretary of Homeland Security Alejandro N. Mayorkas, "[t]hese actions demonstrate[d] our ongoing commitment to Afghan nationals who provided valuable assistance to the United States over the past two decades as well as other Afghans at risk." *DHS Announces Fee Exemptions, Streamlined Processing for Afghan Nationals as They Resettle in the U.S.*, DEP'T OF HOMELAND SEC., https://www.dhs.gov/archive/news/2021/11/08/dhs-announces-fee-exemptions-streamlined-processing-afghan-nationals-they-resettle (Nov. 8, 2021).

Enayetullah Walizada is a citizen of Afghanistan who, "[p]ursuant to the military evacuation initiative known as Operation Allies Welcome," was admitted into the United States "on August 29, 2021, under the Humanitarian parole classification designated as 'OAR' (Operation Allies Refuge)." (Doc. 1 at 2, ¶ 2.) According to Federal Respondents, he was initially paroled for three years, and on November 1, 2023, his parole was extended until August 28, 2025. No additional extensions were requested or granted. At some point in time, Mr. Walizada was granted an employment authorization document. He has a pending asylum case which he filed on November 14, 2022, and attended his affirmative asylum interview on December 13, 2022, although the status of his

4

application is uncertain and no hearing date has been set. He has no known criminal history in the United States or elsewhere.

Mr. Walizada contends that on September 5, 2025, in the course of his employment as a long-haul truck driver, he was "transporting a load of food products from Vermont to California." *Id.* at 2, ¶ 3. "While navigating the route using Google Maps," he "inadvertently approached a United States-Canada border crossing" and "unintentionally made a wrong turn, which resulted in an inadvertent exit from the United States." *Id.* Mr. Walizada was found inadmissible by the Canada Border Services Agency and immediately attempted to re-enter the United States at the Derby Line Port of Entry in Vermont.

According to the Declaration of William West, a Supervisory CBP Officer, "[d]uring primary inspection, [Mr. Walizada] presented an employment authorization document . . . for identification and stated he did not have a passport in his possession." (Doc. 9-1 at 3, ¶ 6.) Mr. Walizada was referred for secondary inspection, at which time record checks revealed his parole had expired on August 28, 2025, with "no pending requests for a further extension of his parole." *Id.* at ¶ 8.

Finding Mr. Walizada "did not have any lawful status to be in the United States," Officer West asserts Mr. Walizada was deemed "inadmissible to the United States pursuant to Section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act [("INA").]"[4] *Id.* at 4, ¶ 9. Mr. Walizada was subsequently detained by CBP and held at the port of entry for six days before being transferred to the Northwest State Correctional Facility in St. Albans, Vermont. Mr. Walizada contends he "was unable to speak with legal counsel for the first [seven] days of his detention despite counsel's repeated attempts to contact him during this time." (Doc. 1 at 6, ¶ 27.)

---

[4] "Except as otherwise specifically provided in this chapter, any immigrant at the time of application for admission . . . who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued by the Attorney General under section 1181(a) of this title . . . is inadmissible." 8 U.S.C. § 1182(a)(7)(A)(i)(I).

Mr. Walizada alleges he "was never served with a charging document and is unaware of the charges against him." *Id.* at ¶ 26. Federal Respondents claim that CBP issued Mr. Walizada a Notice to Appear ("NTA"), which Mr. Walizada signed, and placed him in "full removal proceedings under 8 U.S.C. § 1229a." (Doc. 9 at 3.) Attached to Federal Respondents' September 24, 2025 response is an NTA, dated September 9, 2025, for an immigration hearing scheduled for October 9, 2025. (Doc. 9-2 at 2.) It appears to be signed by Mr. Walizada and charges that Mr. Walizada was placed in removal proceedings as "an arriving alien" and that DHS alleged that:

1. [He is] not a citizen or national of the United States;

2. [He is a] native of Afghanistan and a citizen of Afghanistan;

3. [He was] paroled into the United States at or near Dulles International Airport in Washington D.C.[,] on August 29, 2021;

4. [His] parole expired on August 28, 2025;

5. [He is] an immigrant not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the [INA].

*Id.*

The NTA further provides:

ON THE BASIS OF THE FOREGOING, IT IS CHARGED THAT YOU ARE SUBJECT TO REMOVAL FROM THE UNITED STATES PURSUANT TO THE FOLLOWING PROVISION(S) OF LAW:

212(a)(7)(A)(i)(I) of the [INA], as amended, as an immigrant who, at the time of application for admission, is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the [INA], and a valid unexpired passport, or other suitable travel document, or document of identity and nationality as required under the regulations issued by the Attorney General under section 211(a) of the [INA].

*Id.* at 5.

On October 16, 2025, Mr. Walizada was denied bond by an Immigration Judge ("IJ") based on the IJ's determination that Mr. Walizada "is statutorily ineligible for IJ custody redetermination." (Doc. 17-1 at 2.)

The Executive Branch recently announced that it has indefinitely paused all asylum decisions following the shooting of two National Guard members in the District of Columbia. Mr. Walizada contends that his continued detention without a bond hearing is in violation of applicable law and violates the Fifth Amendment Due Process Clause and the Fourth Amendment because it is indefinite and bears no reasonable relation to a legitimate government purpose.

## II.    Conclusions of Law and Analysis.

### A.    Standard of Review.

"Congress has granted federal district courts, 'within their respective jurisdictions,' the authority to hear applications for habeas corpus by any person who claims to be held 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Rasul v. Bush*, 542 U.S. 466, 473 (2004) (quoting 28 U.S.C. §§ 2241(a), (c)(3)). "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention[.]" *Kapoor v. DeMarco*, 132 F.4th 595, 610 (2d Cir. 2025) (quoting *INS v. St. Cyr*, 533 U.S. 289, 301 (2001)) (internal quotation marks omitted).

### B.    Whether the Court Has Subject Matter Jurisdiction to Consider Mr. Walizada's Habeas Petition.

Under the INA, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (the "IIRIRA"), Congress enacted certain "jurisdiction stripping" provisions to limit federal courts' jurisdiction to review the removal of noncitizens. Federal Respondents acknowledge that because the Petition challenges only Mr. Walizada's detention, the court has jurisdiction to hear his habeas claim. Despite that acknowledgment, Federal Respondents argue that, "[t]o the extent that [Mr. Walizada] also contests the initiation of removal proceedings against him, this [c]ourt lacks subject-matter jurisdiction" under the jurisdiction-stripping provision of 8 U.S.C. § 1252(g). (Doc. 9 at 7).

The Supreme Court has held that § 1252(g) is "much narrower" than a restriction on judicial review in all deportation cases and "was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." *Reno v. Am.-Arab*

7

*Anti-Discrimination Comm.*, 525 U.S. 471, 482, 485 n.9 (1999). "The provision applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Id.* at 482 (emphasis in original) (quoting § 1252(g)). The Supreme Court has "not interpret[ed] this language to sweep in any claim that can technically be said to "arise from" the three listed actions of the Attorney General. Instead, [it] read[s] the language to refer to just those three specific actions themselves." *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (opinion of Alito, J., joined by Roberts, C.J., and Kennedy, J.).

The Second Circuit has found that claims of unlawful detention brought by a petitioner with pending removal proceedings did "not arise from the government's commencement of proceedings" because filing an NTA "in an immigration court is the action that commences removal proceedings[,]" and ICE detained the petitioner "*before* an NTA was filed with the immigration court." *Ozturk v. Hyde*, 136 F.4th 382, 398 (2d Cir. 2025) (alteration adopted) (emphasis in original) (internal quotation marks and citation omitted). Similarly, Mr. Walizada challenges only his detention by CBP beginning on September 5, 2025, which *preceded* the issuance of Mr. Walizada's NTA on September 9, 2025. Because Mr. Walizada is not challenging the initiation of removal proceedings but rather his prolonged detention during those proceedings as a constitutional challenge, § 1252(g) does not deprive the court of jurisdiction in this case.

The Federal Respondents also invoke 8 U.S.C. §§ 1252(b)(9) and 1252(a)(2)(D) to the extent Mr. Walizada challenges his removability, contending that any such challenges must be brought in immigration court and appealed in the appropriate court of appeals after a final order of removal is issued. Because Mr. Walizada is not challenging his removability, §§ 1252(b)(9) and 1252(a)(2)(D) do not bar this court's jurisdiction.

## C.    Whether Mr. Walizada's Detention is Governed by 8 U.S.C. § 1225 or § 1226.

During the October 7, 2025 hearing and in their response to Mr. Walizada's supplemental brief, the Federal Respondents conceded that whether Mr. Walizada effected a "departure" from the United States for purposes of immigration law has no

8

impact on the basis or legality of his detention. They have therefore abandoned any claim that he was detained on September 5, 2025, because he was an "arriving alien" who sought to enter the United States without a valid travel document, even though this is the sole legal ground for his detention set forth in the NTA. Instead, the Federal Respondents assert that because Mr. Walizada's parole expired on August 28, 2025, his immigration status reverted to an "applicant for admission seeking admission" and an "arriving alien," subjecting him to mandatory detention under 8 U.S.C. § 1225(b). Mr. Walizada counters that because he was not affirmatively seeking admission at the time of his encounter with CBP, his detention is governed by 8 U.S.C. § 1226(a), and he is entitled to an individualized bond determination. Mr. Walizada also argues that, if he is detained under § 1226(a), he is improperly detained without the warrant § 1226(a) requires.

### 1.    Statutory and Regulatory Framework.

Section 1225(a) provides that "[a]n alien present in the United States who has not been admitted or who arrives in the United States . . . shall be deemed for purposes of this chapter an applicant for admission." 8 U.S.C. § 1225(a)(1). An "[a]rriving alien" includes "an applicant for admission coming or attempting to come into the United States at a port-of-entry[.]" 8 C.F.R. § 1.2.

Applicants for admission "fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2)." *Jennings*, 583 U.S. at 287. "Section 1225(b)(1) applies to aliens initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation[,]" and "certain other aliens designated by the Attorney General in h[er] discretion." *Id.* (citing 8 U.S.C. § 1225(b)(1)(A)(i)). Section 1225(b)(2) "serves as a catchall provision that applies to all [other] applicants for admission[.]" *Id.*

Applicants covered by § 1225(b)(1) are removed "without further hearing or review" pursuant to an expedited removal process unless the person "indicates either an intention to apply for asylum . . . or a fear of persecution[,]" in which case that person is referred for an asylum interview. 8 U.S.C. § 1225(b)(1)(A)(i)-(ii). Applicants covered by

§ 1225(b)(2) are placed in full removal proceedings under 8 U.S.C. § 1229a. 8 U.S.C. § 1225(b)(2)(A).

The Supreme Court has interpreted both § 1225(b)(1) and (b)(2) as "mandat[ing] detention of applicants for admission until certain proceedings have concluded." *Jennings*, 582 U.S. at 297.

> Section 1225(b)(1) aliens are detained for "further consideration of the application for asylum," and § 1225(b)(2) aliens are in turn detained for "[removal] proceeding[s]." Once those proceedings end, detention under § 1225(b) must end as well. Until that point, however, nothing in the statutory text imposes any limit on the length of detention. And neither § 1225(b)(1) nor § 1225(b)(2) says anything whatsoever about bond hearings.

*Id.* (alterations in original).

The "only exception" to this mandatory detention scheme is that "applicants for admission may be temporarily released on parole 'for urgent humanitarian reasons or significant public benefit[]'" pursuant to 8 U.S.C. § 1182(d)(5)(A). *Mata Velasquez v. Kurzdorfer*, 794 F. Supp. 3d 128, 139 (W.D.N.Y 2025) (quoting *Jennings*, 583 U.S. at 288). Such parole "permits a noncitizen to physically enter the country . . . subject to a reservation of rights by the [g]overnment that it may continue to treat the noncitizen 'as if stopped at the border[.]'" *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 484 (S.D.N.Y. 2025) (quoting *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020)).

Parole "shall not be regarded as an admission of the alien[,]" and when parole expires or is revoked, "the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). The implementing regulations provide that when parole expires, a noncitizen "*shall again be released on parole*" if the "exclusion, deportation, or removal order cannot be executed within a reasonable time," unless a DHS official determines that "the public interest requires that the alien be continued in custody." 8 C.F.R. § 212.5(e)(2)(i) (emphasis supplied).

10

Whereas Section 1225(b) "authorizes the [g]overnment to detain certain aliens *seeking admission* into the country[,]" Section 1226 "authorizes the [g]overnment to detain certain aliens *already in the country* pending the outcome of removal proceedings[.]" *Jennings*, 583 U.S. at 289 (emphasis supplied). Section 1226(a) establishes a discretionary detention framework for noncitizens arrested and detained "[o]n a warrant issued by the Attorney General[.]" 8 U.S.C. § 1226(a). Pending the removal decision, the Attorney General may: (1) "continue to detain the arrested alien"; (2) "release the alien on . . . bond"; or (3) "release the alien on . . . conditional parole[.]" *Id.* at §§ 1226(a)(1)-(2). "Critically, under 8 C.F.R. § 1236.1(d)(1), a noncitizen detained under § 1226 may appeal an 'initial custody determination,' including the setting of bond, to an immigration judge." *Lopez Benitez*, 795 F. Supp. 3d at 484. An exception exists for "[n]on-citizens who meet certain criminal and inadmissibility criteria[,]" not implicated in this case, who are subject to mandatory detention under § 1226(c). *Martinez v. Hyde*, 792 F. Supp. 3d 211, 221 (D. Mass. 2025); *see also* 8 U.S.C. § 1226(c).

### 2.    Bureau of Immigration Appeals Adopts Mandatory Detention Framework.

On September 5, 2025, the Bureau of Immigration Appeals ("BIA"), in *Matter of Yajure Hurtado*, ruled that § 1225 applies its mandatory detention scheme to "all applicants for admission, even those . . . who have entered without admission or inspection and have been residing in the United States for years without lawful status[.]" 29 I. & N. Dec. 216, 220 (BIA 2025). Numerous courts have disagreed with this interpretation as inconsistent with statutory authority, past agency practice, and legislative intent.[5]

---

[5] *See, e.g.*, *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 491 (S.D.N.Y. 2025); *J.G.O. v. Francis*, 2025 WL 3040142, at *4 (S.D.N.Y. Oct. 28, 2025); *Artiga v. Genalo*, 2025 WL 2829434, at *8 (E.D.N.Y. Oct. 5, 2025); *Martinez v. Hyde*, 792 F. Supp. 3d 211, 214 (D. Mass. 2025); *Moldonado Vazquez v. Feeley*, 2025 WL 2676082, at *16 (D. Nev. Sept. 17, 2025); *Hasan v. Crawford*, 2025 WL 2682255, at *9 (E.D. Va. Sept. 19, 2025); *cf. Bautista v. Santacruz*, 2025 WL 3289861, at *11 (C.D. Cal. Nov. 20, 2025) ("Where statutory language is unambiguous and 'the statutory scheme is coherent and consistent,' the [c]ourt must end its inquiry. . . . [T]here is no need to engage with canons of construction, legislative history and intent, implementing

11

In interpreting §§ 1225 and 1226, this court is not bound by BIA precedent. "When the meaning of a statute [is] at issue, the judicial role [is] to interpret the act of Congress, in order to ascertain the rights of the parties." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) (internal quotation marks and citation omitted). "[A]gencies have no special competence in resolving statutory ambiguities. Courts do." *Id.* at 373. Under *Loper Bright*, this court is also not required to afford the BIA's recent change in interpretation deference, particularly when that holding has not "remained consistent over time." *Id.* at 386. However, "the longstanding practice of the government—like any other interpretive aid—can inform a court's determination of what the law is." *Id.* (alterations adopted) (internal quotation marks and citations omitted).

### 3.    Mr. Walizada's Status Following Expiration of His Parole.

Although the NTA notes that Mr. Walizada's parole has expired, neither party addresses the NTA's failure to cite the expiration of Mr. Walizada's parole as the statutory grounds for his placement in removal proceedings. Instead, the sole legal ground for removal set forth in the NTA is that Mr. Walizada is

> an immigrant who, at the time of application for admission, is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the [INA], and a valid unexpired passport, or other suitable travel document, or document of identity and nationality as required under the regulations issued by the Attorney General under section 211(a) of the [INA].

(Doc. 9-2 at 5.) At oral argument, the Federal Respondents abandoned any claim that Mr. Walizada's detention was justified by his lack of a valid entry document on September 5, 2025. Accordingly, the Federal Respondents have arguably abandoned the sole legal ground for removal proceedings set forth in the NTA. Mr. Walizada agrees that his status reverted to that of an "applicant for admission" upon expiration of his parole, but contends that, because he has been continuously present in the United States and was not affirmatively seeking entry when he was apprehended, he is subject to § 1226(a), not

---

regulations, or agency practice.") (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989)).

§ 1225(b). In response, the Federal Respondents advance three arguments as to why Mr.
Walizada is subject to mandatory detention under § 1225(b).

### a.   Mr. Walizada's Status as an "Applicant for Admission."

The Federal Respondents first argue that as an "applicant for admission," Mr.
Walizada is subject to mandatory detention under § 1225(b)(2) as "an alien seeking
admission," whether he was actively seeking entry or not. Mr. Walizada contends that
such an interpretation contradicts the plain meaning of § 1225(b)(2).

Courts within the Second Circuit and across the country have rejected the Federal
Respondents' interpretation of § 1225(b)(2).[6] Section 1225(b)(2)(A) provides:

> Subject to subparagraphs (B) and (C), in the case of an alien who is an
> applicant for admission, if the examining immigration officer determines
> that *an alien seeking admission* is not clearly and beyond a doubt entitled to
> be admitted, the alien shall be detained for a proceeding under section
> 1229a of this title.

8 U.S.C. § 1225(b)(2)(A) (emphasis supplied). Employing traditional canons of statutory
interpretation, courts have found that "applicant for admission" and "seeking admission"
are distinct concepts, reflected by their different terms. The court finds the Southern
District of New York's statutory interpretation in *Lopez Benitez* persuasive and thus
quotes from it extensively:

> First, as *Martinez* concluded, [Federal Respondents'] argument would
> render the phrase "seeking admission" in § 1225(b)(2)(A) mere surplusage.
> *See* [792 F. Supp. 3d at 217] (describing respondents as treating the phrase
> "seeking admission" as mere surplusage of the "applicant" requirement in
> § 1225(b)(2)(A)). . . . If, as [Federal] Respondents argue, § 1225(b)(2)(A)
> were intended to apply to all "applicants for admission," there would be no
> need to include the phrase "seeking admission" in the statute. . . . By reading
> a phrase out of the statute, [Federal] Respondents' interpretation of § 1225

---

[6] *See, e.g.*, *Lopez Benitez*, 795 F. Supp. 3d at 487-90 (finding the plain meaning principle, whole
act rule, presumption against superfluity, and presumption of meaningful variation, as well as the
implementing regulations, support an interpretation of § 1225(b)(2) that limits its applicability to
noncitizens actively seeking admission to the United States and does not apply to noncitizens
already residing in the country who are "arrested on a warrant issued by the Attorney General
while residing in the United States"); *J.G.O.*, 2025 WL 3040142, at *3-4 (same); *Artiga*, 2025
WL 2829434, at *7-8 (same); *Martinez*, 792 F. Supp. 3d at 217-21 (same); *Maldonado Vazquez*,
2025 WL 2676082, at *12-14 (same); *Hasan*, 2025 WL 2682255, at *8 (same).

2:25-cv-00768-cr    Document 20    Filed 12/11/25    Page 14 of 37

clearly "violates the rule against surplusage." *Martinez*, [792 F. Supp. 3d at 218]; *see United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432, 143 S. Ct. 1720, 216 L. Ed. 2d 370 (2023) ("Every clause and word of a statute should have meaning."); *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S. Ct. 441, 151 L. Ed. 2d 339 (2001) ("No clause, sentence, or word shall be superfluous, void, or insignificant.") (quoting *Duncan v. Walker*, 533 U.S. 167, 174, 121 S. Ct. 2120, 150 L. Ed. 2d 251 (2001)).

*Martinez* further stated that [Federal] Respondents' reading of § 1225(b)(2)(A) "negates the plain meaning of the text." [792 F. Supp. 3d at 218] (citing *Polansky*, 599 U.S. at 432, 143 S. Ct. 1720). . . . While [Federal R]espondents are correct that Mr. [Walizada] was never "admitted" to the United States . . . (and is therefore treated as an "applicant for admission" under various provisions of the statute), it does not follow that he continues to be actively "seeking" such lawful entry at this time. He has already "entered" the country . . . . [Federal] Respondents' interpretation of § 1225(b)(2)(A) simply ignores the statute's present-tense active language. *See Matter of M-D-C-V-*, 28 I. & N. Dec. 18, 23 (B.I.A. 2020) ("The 'use of the present progressive, like use of the present participle, denotes an ongoing process.'") (quoting *Al Otro Lado v. Wolf*, 952 F.3d 999, 1011-12 (9th Cir. 2020)). And by treating the terms "applicant for admission" and "alien seeking admission" as synonymous, [Federal] Respondents' interpretation violates the principle that Congress is presumed to have acted intentionally in choosing different words in a statute, such that different words and phrases should be accorded different meanings. *See Yale New Haven Hosp. v. Becerra*, 56 F.4th 9, 21 (2d Cir. 2022) (describing the "meaningful-variation canon" as "the principle that where a statutory scheme has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea") (citing *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457-58, 142 S. Ct. 1783, 213 L. Ed. 2d 27 (2022)).

The implementing regulations—which were "promulgated mere months after passage of the statute" and have remained consistent over time— further underscore the active nature of the term "seeking admission" in § 1225(b). *Martinez*, [792 F. Supp. 3d at 219] (citing [*Loper Bright*, 603 U.S. at 385-86]). Pursuant to those regulations, the term "arriving alien," *see id.* (citing 8 C.F.R. § 235.3(c)(1)), is treated as "roughly interchangeable with an 'applicant seeking admission,'" and is defined as "an applicant for admission *coming or attempting to come into* the United States," *id.* (citing 8 C.F.R. § 1.2) (emphasis added). "In other words, an 'arriving alien' is an 'applicant' who is also doing something: 'coming or attempting to come into the United States.'" *Id.* "This mirrors the text of section 1225(b)(2)(A),"

14

under which detention is mandatory for an "applicant" who is "doing something: 'seeking admission.'" *Id.*

This understanding accords with the plain, ordinary meaning of the words "seeking" and "admission." For example, someone who enters a movie theater without purchasing a ticket and then proceeds to sit through the first few minutes of a film would not ordinarily then be described as "seeking admission" to the theater. Rather, that person would be described as already present there. Even if that person, after being detected, offered to pay for a ticket, one would not ordinarily describe them as "seeking admission" (or "seeking" "lawful entry") at that point—one would say that they had entered unlawfully but now seek a lawful means of remaining there. As § 1225(b)(2)(A) applies only to those noncitizens who are actively "seeking admission" to the United States, it cannot, according to its ordinary meaning, apply to Mr. [Walizada], because he has already been residing in the United States for several years.

[Federal] Respondents' interpretation fails for several additional reasons. For instance, the *Martinez* court explained that "section 1225(b)(2) cannot be read to mandate detention of non-citizens already present within the United States as that would nullify a recent amendment to the immigration statutes." *Id.* at [220] (citing *Gomes* [*v. Hyde*], 2025 WL 1869299, at \*5-8 [(D. Mass. July 7, 2025)]). As noted, an amendment codified at § 1226(c), "added only months ago, mandates detention for non-citizens who meet certain criminal *and* inadmissibility criteria." *Id.* [at 221] (citing *Gomes*, 2025 WL 1869299, at \*6) (emphasis added). But if, as [Federal] Respondents suggest, "a non-citizen's inadmissibility were alone already sufficient to mandate detention under section 1225(b)(2)(A), then the 2025 amendment," which requires detention for noncitizens who are *both* inadmissible and meet certain criminal criteria, "would have no effect." *Id.* (citing *Gomes*, 2025 WL 1869299, at \*7); *see Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386, 133 S. Ct. 1166, 185 L. Ed. 2d 242 (2013) ("The canon against surplusage is strongest when an interpretation," such as this one, "would render superfluous another part of the same statutory scheme."); *Gundy v. United States*, 588 U.S. 128, 141, 139 S. Ct. 2116, 204 L. Ed. 2d 522 (2019) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). Such a result, *Martinez* opined, is "presumptively dubious" and further supports the conclusion that sections 1225 and 1226 "apply to different classes" of noncitizens. [792 F. Supp. 3d at 221] (citing *Matter of M-S-*, 27 I. & N. Dec. 509, 516 (Att'y Gen. 2019) ("Section 1225 (under which detention is mandatory) and section 1226 (under which detention is permissive) can be reconciled only if they apply to different classes of aliens.")).

*Lopez Benitez*, 795 F. Supp. 3d at 487-90 (alterations adopted). "In sum, the [F]ederal [R]espondents' interpretation is presumptively wrong, particularly given that §§ 1225 and 1226 were enacted as part of the same statutory scheme." *Hasan v. Crawford*, 2025 WL 2682255, at *8 (E.D. Va. Sept. 19, 2025).

Courts have noted that the Federal Respondents' proposed expansion of § 1225(b)(2)'s applicability contradicts both legislative history and "over [thirty] years of agency action . . . determining bond for noncitizens who are already in the country and facing removal[]" under § 1226(a). *Contreras-Cervantes v. Raycraft*, 2025 WL 2952796, at *6 (E.D. Mich. Oct. 17, 2025); *see also Maldonado Vazquez v. Feeley*, 2025 WL 2676082, at *15 (D. Nev. Sept. 17, 2025); *Lopez Benitez*, 795 F. Supp. 3d at 490 ("[D]ecades of practice reflect DHS's longstanding interpretation of § 1226(a) as applying to those who have crossed the border between ports of entry and are shortly thereafter apprehended.") (alterations adopted) (internal quotation marks and citation omitted).

This court agrees that "§ 1225(b)(2)(A) applies only to those noncitizens who are actively 'seeking admission' to the United States, [and] it cannot, according to its ordinary meaning, apply to [noncitizens] . . . residing in the United States for several years." *Id.* at 489.[7] Applicability of § 1225(b)(2) thus requires "an 'examining immigration officer' [to] determine that the individual is: (1) an 'applicant for admission'; (2) 'seeking admission'; and (3) 'not clearly and beyond a doubt entitled to be admitted.'" *Martinez*, 792 F. Supp. 3d at 214. For this reason, Federal Respondents' reliance on Mr. Walizada's status as an "applicant for admission" does not render his

---

[7] While courts also relied on facts that demonstrated the government initially treated the noncitizen under § 1226(a); for example, by issuing a warrant pursuant to § 1226(a), *see, e.g.*, *Lopez Benitez*, 795 F. Supp. 3d at 485, *Hasan*, 2025 WL 2682255, at *7, or having previously released the noncitizen on recognizance in accordance with § 1226(a), *see, e.g.*, *J.G.O.*, 2025 WL 3040142, at *4, *Hasan*, 2025 WL 2682255, at *7, the absence or presence of a warrant or release on recognizance are not dispositive. *See, e.g.*, *Lopez Benitez*, 795 F. Supp. 3d at 486 ("Even without [Federal] Respondents' prior concessions as reflected in their exhibits, the [c]ourt reaches the same conclusion in light of a proper understanding of the statutory provisions at issue.").

detention mandatory under § 1225(b)(2), as he was not seeking admission to the United States at the time of his apprehension.

### b.    Mr. Walizada's Status Due to His Pending Asylum Application.

The Federal Respondents alternatively argue that Mr. Walizada's detention is independently mandated by § 1225(b)(1) because Mr. Walizada has applied for asylum. Section 1225(b)(1) states in relevant part:

> If an immigration officer determines that an alien . . . *who is arriving* in the United States . . . indicates either an intention to apply for asylum . . . or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

8 U.S.C. § 1225(b)(1)(A)(ii) (emphasis supplied). Thereafter, "[i]f the officer determines at the time of the interview that an alien has a credible fear of persecution . . . the alien shall be detained for further consideration of the application for asylum." 8 U.S.C. § 1225(b)(1)(B)(ii). The Federal Respondents seize on the "shall be detained" language of § 1225(b)(1)(B)(ii), but, like § 1225(b)(2), § 1225(b)(1) uses a present-progressive verb, requiring, as a condition precedent, that the alien be a person "who is arriving in the United States[.]" 8 U.S.C. § 1225(b)(1)(A)(ii). Only then is the mandatory detention scheme for an asylum applicant triggered. The plain reading of § 1225(b)(1) therefore requires "some sort of present-tense action." *Martinez*, 792 F. Supp. 3d at 218. This approach is buttressed by the provisions' "context and . . . their place in the overall statutory scheme." *Gundy*, 588 U.S. at 141. "Every part of § 1225 suggests that it applies to aliens who are arriving in the country." *J.G.O. v. Francis*, 2025 WL 3040142, at *4 (S.D.N.Y. Oct. 28, 2025).

For example, § 1225(b)(1) is titled "Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled[.]" 8 U.S.C. § 1225(b)(1). An "inspection" generally refers to an examination conducted by an immigration officer at a U.S. port of entry. *See* 8 C.F.R. § 235.1(a). Other provisions of § 1225(b)(1) similarly involve individuals who are seeking entry into the United States, not people living here. Section 1225(b)(1)(A), entitled "Screening[,]" identifies reasons a

17

noncitizen may be denied admission after an immigration officer's evaluation. No inspection or screening takes place for a noncitizen residing in the United States who is subsequently detained because his or her parole has expired. By their plain language and placement in the statutory scheme, as well as the realities of the immigration process, the expedited removal proceedings authorized under § 1225(b)(1) are limited to aliens "arriving in the United States[.]" 8 U.S.C. § 1225(b)(1)(A)(i). Because Mr. Walizada was not "arriving in the United States" at the time of his apprehension and detention, a fact the Federal Respondents concede, his pending asylum application does not render his detention mandatory under § 1225(b)(1).

        **c.**    **Mr. Walizada's Status Due to the Expiration of His Parole.**

8 U.S.C. § 1182(d)(5)(A) provides that parole does not constitute admission of the noncitizen and that, when parole expires, the noncitizen "shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *See also* 8 C.F.R. § 212.5(e)(2)(i) (upon expiration of parole, the noncitizen "shall be restored to the status that he or she had at the time of parole"). The implementing regulations define an "[a]rriving alien" to include "an applicant for admission coming or attempting to come into the United States at a port-of-entry" and note that "[a]n arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the [INA], and even after any such parole is terminated or revoked." 8 C.F.R. § 1.2.

It is undisputed that Mr. Walizada was, at one time, an "arriving alien" who was paroled into the United States as part of a program to grant admission to individuals who had served as allies to the United States in Afghanistan. It is equally undisputed that his parole has now expired, not because of any act or omission on his part, but because the Executive Branch has not extended it.

The Federal Respondents acknowledge that Mr. Walizada has no criminal history here or elsewhere. They do not contend that Mr. Walizada presents a direct, indirect, or unknown threat to the United States. Nor do they allege that Mr. Walizada is a flight risk

with respect to his removal proceedings. The implementing regulations of parole provide that when parole expires, a noncitizen "*shall again be released on parole*" if the "exclusion, deportation, or removal order cannot be executed within a reasonable time," unless a DHS official determines that "the public interest requires that the alien be continued in custody." 8 C.F.R. § 212.5(e)(2)(i) (emphasis supplied). The Federal Respondents do not claim to have made such a determination. They nonetheless argue that, as a result of the expiration of Mr. Walizada's parole, not only did he revert to an "applicant for admission," but he also reverted to, and in fact was always, an "arriving alien," even after residing in the United States for several years. As courts have observed, this treats two different statutory terms as if they are synonymous. *See Lopez Benitez*, 795 F. Supp. 3d at 488. Mr. Walizada rejects this characterization, contending that it ignores the proper statutory construction of § 1225 requiring noncitizens to be "seeking entry" into the country to be deemed "arriving aliens" and reflects "an overextension of DHS's authority[.]" (Doc. 12 at 3.)

In *Ibragimov v. Gonzales*, the Second Circuit considered whether a noncitizen who had overstayed his visa was properly treated as an "arriving alien" subject to mandatory detention under § 1225(b) three years after he had left and returned to the United States pursuant to a grant of advance parole. 476 F.3d 125, 132-33 (2d Cir. 2007). Mr. Ibragimov had entered the United States on a valid visa in September 1992. Following expiration of his visa in March 1993, he remained in the country and, in November 1995, married a United States citizen, after which he filed an application to adjust his immigration status. "While these applications were pending before the Immigration and Naturalization Service ('INS'), [Mr. Ibragimov] applied for 'advance parole,' *i.e.*, permission to leave and return to the United States with the government's prior authorization pending resolution of his immigration status." *Id.* at 129. INS granted him advance parole in July 1996 but warned him that if his application for status adjustment were denied, he would be subject to removal proceedings. He returned to the United States pursuant to the grant of advance parole in July 1998. His application for status adjustment was denied in October 1999. In July 2001, his parole was revoked and, in

19

October 2001, the INS issued him an NTA for removal proceedings as an applicant for admission lacking a valid entry document based on his July 1998 arrival in the United States. Mr. Ibragimov argued that because he was "no longer 'seeking inspection to the United States' but, rather, had 'already arrived[,]'" he did not satisfy the definition of an "arriving alien" when his NTA was issued in October 2001. *Id.* at 136.

Relying on the INA's implementing regulations in its pre-*Loper Bright* decision, the Second Circuit rejected Mr. Ibragimov's interpretation and held that he was appropriately considered an "arriving alien" following termination of his advance parole.[8] The Second Circuit first noted Mr. Ibragimov's argument "ignores the regulation's command that 'an arriving alien *remains such even if paroled* pursuant to [INA] section 212(d)(5).'" *Id.* at 136 (emphasis and alteration in original) (quoting 8 C.F.R. § 1.1(q) (2007)).[9] The Second Circuit observed that his contention was "further undermined by the terms of 8 C.F.R. § 212.5(e)(2)(i), which provides that upon termination of an alien's parole, the alien 'shall be restored to the status that he or she had *at the time of parole*.'" *Id.* (emphasis in original) (quoting 8 C.F.R. § 212.5(e)(2)(i)). "[T]he 'time of parole' occurs when the alien is actually paroled into the country by immigration officials at a port-of-entry." *Id.* As a result, the Second Circuit concluded that Mr. Ibragimov's "status

---

[8] In a footnote, the Second Circuit analyzed the regulations' applicability to advance parole under *Chevron*, noting that Mr. Ibragimov did "not explicitly argue that the pertinent INS regulations reflect an impermissible interpretation of the parole statute under the well-known principles of *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)." *Ibragimov v. Gonzales*, 476 F.3d 125, 137 n.17 (2d Cir. 2007). Applying *Chevron* deference, the Second Circuit "[a]ppl[ied] the first step of *Chevron* analysis, [and] conclude[d] . . . that the parole statute is silent on the question of what status should be accorded to *advance* parolees who have previously overstayed their visas." *Id.* (emphasis in original). Moving to the second step of *Chevron*, the Second Circuit concluded "that the relevant INS regulations are 'reasonable' and not 'arbitrary, capricious, or manifestly contrary' to the intent of Congress, and therefore are entitled to deference[.]" *Id.* (quoting *Chevron*, 467 U.S. at 845). "In particular, the interpretation embraced by the INS's regulations—*i.e.*, that advance parolees remain arriving aliens even after they have re-entered the United States—fully accords with the statute's general command that parole does not afford an alien legal admission to the country." *Id.*

[9] 8 C.F.R. § 1.1(q) (2007) and 8 C.F.R. § 1.2 (2025) provide the same definition for "arriving alien."

reverted to that which he held at the time he was paroled into the United States in July 1998—namely, that of an 'arriving alien' seeking admission at our borders." *Ibragimov*, 476 F.3d at 137. It consequently held that Mr. Ibragimov was appropriately subject to removal. In so ruling, the Second Circuit held that:

> [t]he statute specifically states that "parole of an alien *shall not* be regarded as an admission of the alien" and that "when the purposes of such parole shall have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other *applicant for admission* to the United States." [8 U.S.C. § 1182(d)(5)(A)] (emphasis added)[.]

*Id.* at 134 (alterations adopted).

Since the Supreme Court has held that "courts must exercise independent judgment in determining the meaning of statutory provisions[,]" a court may, but need not, defer to agencies' interpretations. *Loper Bright*, 603 U.S. at 394. Following this controlling precedent, at least one court has squarely rejected the proposition that parolees who have resided in the United States for years are perpetually considered "arriving aliens" due to their initial parole and are accorded less favorable treatment than noncitizens who are found in the United States after entering illegally.[10]

In *Coalition for Humane Immigrant Rights v. Noem* ("*Coalition for HIR*"), the District Court for the District of Columbia addressed DHS's attempt to subject noncitizens who were initially paroled into the United States under programs for nationals from Cuba, Haiti, Nicaragua, and Venezuela to expedited removal under § 1225(b)(1)(A)(i) following expiration of their parole. 2025 WL 2192986 (D.D.C. Aug. 1, 2025), *appeal docketed*, No. 25-5289 (D.C. Cir. Aug. 11, 2025). In contending that they were not subject to § 1225(b)(1), the plaintiffs argued that the present-progressive

---

[10] *See also Rodriguez Cabrera v. Mattos*, 2025 WL 3072687, at *10 (D. Nev. Nov. 3, 2025) (deciding the case on constitutional rather than statutory grounds, but noting that "the [c]ourt doubts [it] is a reasonable interpretation of the relevant statutory provisions" that a noncitizen initially paroled into the country is perpetually subject to mandatory detention as a result of that initial parole).

tense "signals an action that is temporary but currently occurring" and, thus, "[o]nce inspected at the border and paroled into the country, . . . a noncitizen is no longer in the process of 'arriving.'" *Id.* at *27 (internal quotation marks omitted). The *Coalition for HIR* court found that the "[p]laintiffs' interpretation is the best reading of the statute, despite DHS's longstanding regulation to the contrary." *Id.* at *28 (citing *Loper Bright*, 603 U.S. at 394). In making this determination, the court first considered the ordinary meaning of the term "arriving," recognizing that to "'[a]rrive' means 'to reach a destination' or 'to make an appearance.'" *Id.* (quoting *Arrive*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (1996)). The statute:

> [r]ead according to its plain meaning, [means] a noncitizen "arriving" in the United States would be one who is in the process of reaching his or her destination (the United States) and making an appearance here. It would not naturally be read to refer to someone who previously reached the United States via a port of entry, underwent inspection at that port of entry, and then was paroled into the United States (beyond their original destination) for an indefinite period of time. Thus, if the plain language governs, [the p]laintiffs have the upper hand.

*Id.* The court came to the same conclusion upon considering the term's context within the statute, agreeing with the plaintiffs that the IIRIRA uses "'arrive,' or some conjugation thereof," throughout the statute "to refer to physical arrival at a port of entry." *Id.*

The *Coalition for HIR* court found *Leng May Ma v. Barber* distinguishable because it interpreted "the distinct term 'within the United States' for purposes of a different provision of the INA[]" and therefore had no bearing on the meaning of "arriving." *Coalition for HIR*, 2025 WL 2192986, at *28 (citing 357 U.S. 185, 188 (1958)). It noted that the Second Circuit "described parole as 'a means by which the government allows aliens *who have arrived at a port-of-entry* to temporarily remain in the United States pending the review and adjudication of their immigration status." *Id.* (emphasis in original) (quoting *Ibragimov*, 476 F.3d at 134). "Under that construction, while a parolee remains 'legally unadmitted,' they 'have arrived'—*i.e.*, their arrival is complete, whereas their admission is not." *Id.* (quoting *Ibragimov*, 476 F.3d at 134). The court found that the Fifth Circuit's holding in *Duarte v. Mayorkas*, that noncitizens on

22

parole remain "applicants for admission," unpersuasive in determining whether they
remained "arriving" because "'those whose lives are governed by law are entitled to rely
on its ordinary meaning, not left to speculate about hidden messages.'" *Id.* (quoting
*Feliciano v. Dep't of Transp.*, 605 U.S. 38, 45 (2025)).

To further support its plain language statutory interpretation, the *Coalition for HIR*
court highlighted conflicts within the regulatory definitions and the statutory scheme. In
particular, 8 C.F.R. § 212.5(e)(2)(i) states that, upon expiration of parole, an alien "shall
be restored to the status that he or she had at the time of parole[,]" while 8 C.F.R. § 1.2
declares that "[a]n arriving alien remains an arriving alien even if paroled[.]" As the court
pointed out, a paroled noncitizen cannot "revert" to an "arriving alien" if he or she "never
leaves that status[.]" *Coalition for HIR*, 2025 WL 2192986, at *29. The court therefore
found that "the regulatory definition provides little insight into the statutory definition—
the latter of which is our concern here." *Id.; see also Loper Bright*, 603 U.S. at 388
(explaining that courts interpreting a regulatory statute give more or less weight to an
agency interpretation depending on "'the thoroughness evident in [the agency's]
consideration, the validity of its reasoning, its consistency with earlier and later
pronouncements, and all those factors which give it power to persuade, if lacking power
to control'") (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

The *Coalition for HIR* court also examined the legislative history of the relevant
statutes and cited a House Report that observed that expedited removals were "necessary
because thousands of aliens arrive in the U.S. at airports each year without valid
documents and attempt to illegally enter the U.S." *Coalition for HIR*, 2025 WL 2192986,
at *29 (quoting H.R. REP. NO. 104-469, at 158 (1996)). It "use[d] the term 'arrive' in a
way that clearly describes physical arrival at a port of entry" and "did not explicitly
contemplate a regime wherein noncitizens arriving at airports are paroled into the country
and returned to their airport of origin months or years later." *Id.* With respect to the
statute's purpose, the court noted the government's position would grant "a noncitizen
who snuck into the country outside of an inspection point . . . a full [§ 1229a] removal
hearing as long as they have been physically present in the United States for two years[,]"

23

but "a noncitizen who entered at an inspection point and was paroled after inspection can face expedited removal forever, regardless of how long they have been physically present in the United States." *Id.* The inequity is compounded if the noncitizen who enters the country illegally and is found here is entitled to a bond hearing and a lawful entry by a person granted parole is not. "[P]arolees' physical presence within the United States cannot be said to be unlawful or illegal because it is authorized by the Attorney General, and parole has long been understood to constitute lawful status." *United States v. Balde*, 943 F.3d 73, 84 (2d Cir. 2019).

This court finds the *Coalition for HIR* court's reasoning persuasive. Faced with a blank slate, it would adopt its approach in determining whether Mr. Walizada is statutorily considered an "arriving alien" under the INA. Under the Second Circuit's holding in *Ibragimov*, however, parolees return to their status as "arriving aliens" upon expiration or termination of parole, although it is not clear whether the Second Circuit would reach this same conclusion without *Chevron* deference. This approach produces an unjust and counterintuitive result. Mr. Walizada, who was welcomed into the United States after extensive screening, would be entitled to less statutory protection and due process rights than someone who has entered the country illegally and committed certain crimes here.

This court need not resolve this statutory question because Mr. Walizada also asserts a constitutional due process challenge to his ongoing detention. Accordingly, even if Mr. Walizada's detention is mandated by his perpetual status as an "arriving alien" due to his initial parole, a conclusion that appears to be absurd in the facts and circumstances of this case, the court must still consider whether his continued detention satisfies due process.

### D.    Whether Mr. Walizada's Continued Detention Violates Due Process.

Mr. Walizada argues that his prolonged detention violates the Due Process Clause of the Fifth Amendment because his detention "bears no reasonable relation to . . . legitimate government purposes" as he is neither a flight risk nor a danger to the community. (Doc. 17 at 6.) "He has legitimate fears of persecution in Afghanistan, which

the United States government recognized when he was evacuated by the United States military and paroled into the United States under a special 'OAR Parolee' program for Afghans." *Id.* at 6-7. His asylum application remains pending, a process he "continues to diligently pursue[.]" *Id.* at 7. He bears no fault in how long it has taken to process that application.[11] Mr. Walizada also "has no criminal history and maintains strong community ties." *Id.* He requests his immediate release or, in the alternative, an individualized bond hearing held by this court. In the absence of either of those remedies, he requests the court order the immigration court to "adjudicate [his] bond petition on the basis of [his] danger to the community and flight risk, absent the *Matter of Yajure Hurtado* interpretation[.]" *Id.* at 10.

The Federal Respondents assert that Mr. Walizada's detention since September 5, 2025, including seven days when he had no access to an attorney, is not "so prolonged as to violate the Constitution." (Doc. 19 at 5.) They do not address the Executive Branch's recent announcement that it will pause all asylum applications for Afghan Nationals in the wake of a shooting of two National Guard members in the District of Columbia. Alana Wise, *Trump Administration Pausing All Asylum Decisions After National Guard Shooting*, NPR (Nov. 28, 2025), https://www.npr.org/2025/11/28/g-s1-99760/trump-vows-permanent-pause-on-some-immigration-after-national-guard-shooting ("Joseph Edlow, director of U.S. Citizenship and Immigration Services (USCIS), said Friday night that the agency is pausing decisions 'until we can ensure that every alien is vetted and screened to the maximum degree possible.'"). If this policy change is pursued, Mr. Walizada may be detained indefinitely unless he is removed and has to litigate his asylum from the country whose persecution he fears.

---

[11] Mr. Walizada filed his asylum application on November 14, 2022, and attended his asylum interview on December 13, 2022. He has "timely responded to all Requests for Evidence issued by the Asylum Office. In furtherance of his efforts to secure a decision, Mr. Walizada also contacted his congressional representative to request assistance in expediting the adjudication of his pending asylum application." (Doc. 17 at 7.) No future hearing date appears to have been set.

1.    **Whether Detention Under § 1225(b) Can Violate the Due Process Clause.**

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). "[T]he Due Process Clause applies to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Id.* at 693. The right to liberty "includes the right to be free from arbitrary civil immigration detention." *Rashid v. Trump*, 2025 WL 3210955, at *7 (D. Vt. Oct. 27, 2025).

"[D]etention during deportation proceedings [i]s a constitutionally valid aspect of the deportation process." *Demore v. Kim*, 538 U.S. 510, 523 (2003). In the immigration context, detention is justified "where it advances a legitimate governmental purpose,' such as 'ensuring the appearance of aliens at future immigration proceedings and preventing danger to the community.'" *Lopez Benitez*, 795 F. Supp. 3d at 495-96 (citing *Velasco Lopez v. Decker*, 978 F.3d 842, 854 (2d Cir. 2020)). However, detention "can never be punitive, either by design or effect." *Mahdawi v. Trump*, 781 F. Supp. 3d 214, 232 (D. Vt. 2025) (citing *Zadvydas*, 533 U.S. at 690, *Fong Yue Ting v. United States*, 149 U.S. 698, 730 (1893), and *Ozturk v. Trump*, 779 F. Supp. 3d 462, 493 (D. Vt. 2025)); *see also Wong Wing v. United States*, 163 U.S. 228, 237 (1896) (holding that Congress may enable detention pending removal but may not subject "such aliens to infamous punishment at hard labor, or by confiscating their property," without "a judicial trial to establish the guilt of the accused[]").

"[A]n alien [seeking admission] has only those rights regarding admission that Congress has provided by statute" and "the Due Process Clause provides nothing more[.]" *Thuraissigiam*, 591 U.S. at 140. The Second Circuit has observed that, "[t]he Due Process Clause does not protect against all deprivations of constitutionally protected interests in life, liberty, or property, 'only against deprivations without due process of law.'" *Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 464 (2d Cir. 2006) (quoting *Parratt v. Taylor*, 451 U.S. 527, 537 (1981)). The Supreme Court has likewise cautioned

26

that "[t]he Due Process Clause simply does not mandate that all governmental decisionmaking comply with standards that assure perfect, error-free determinations." *Mackey v. Montrym*, 443 U.S. 1, 13 (1979). For this reason, "an arriving alien who ha[s] not effected a legal entry into the United States" is "entitled only to those procedures enacted by Congress, and not to any broader procedural protections based on the constitutional right to due process." *Abitih v. Wilkinson*, 2021 WL 733806, at *2 (W.D.N.Y. Feb. 25, 2021).

Many courts, including this one, have interpreted *Thuraissigiam* as limited to its facts, which involved an arriving alien who claimed he was entitled to additional administrative review of his asylum claim under the Fifth Amendment's Due Process Clause.[12] In this case, Mr. Walizada is not challenging his admissibility determination or removal proceedings but, rather, his detention. Despite *Thuraissigiam*'s limitations on due process for noncitizens seeking admission to the United States, "courts have found that prolonged detention without a proper bond hearing can violate due process[.]" *Rodriguez v. Bondi*, 2025 WL 2490670, at *3 (E.D. Va. June 24, 2025).

In *Black v. Decker*, the Second Circuit considered the constitutionality of prolonged detention under 8 U.S.C. § 1226(c)[13] and held that "[c]ritically, . . . *Demore*

---

[12] *See, e.g.*, *Petrova v. U.S. Dep't of Homeland Sec.*, 2025 WL 2772764, at *24-25 (D. Vt. Sept. 26, 2025) (limiting *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103 (2020), to challenges to a noncitizen's admissibility determination and denying a motion to dismiss a noncitizen's due process claim arising from the revocation of her visa and subjection to criminal proceedings); *Mata Velasquez v. Kurzdorfer*, 794 F. Supp. 3d 128, 151 (W.D.N.Y. 2025) (interpreting *Thuraissigiam* as "foreclos[ing] the argument that [an arriving alien] has due process rights beyond those provided by statute concerning the process for deciding whether or not he [or she] will be *admitted* to this country") (emphasis in original); *see also Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1171 (W.D. Wash. 2023) (rejecting argument that "*Thuraissigiam* [stands for] a broad rule that any inadmissible noncitizen possesses only those due process rights afforded to them by statute, regardless of the nature of their status or the relief they seek" because "*Thuraissigiam*'s discussion of due process is necessarily constrained to challenges to admissibility to the United States"); *A.L. v. Oddo*, 761 F. Supp. 3d 822, 825 (W.D. Pa. 2025) ("Nowhere in [*Thuraissigiam*] did the Supreme Court suggest that arriving aliens being held under § 1225(b) . . . have no due process rights whatsoever.").

[13] 8 U.S.C. § 1226(c) requires the mandatory detention of noncitizens who have been convicted of or arrested for certain crimes pending the final resolution of their removal proceedings.

and *Jennings* le[ft] open the question whether prolonged detention under section 1226(c) without a bond hearing will *at some point* violate an individual detainee's due process rights[]" and did not address "what procedures due process may require[.]" 103 F.4th 133, 142 (2d Cir. 2024) (emphasis in original). The Second Circuit concluded "that due process bars the Executive from detaining [noncitizens] for an unreasonably prolonged period under section 1226(c) without a bond hearing." *Id.* at 143. In reaching that conclusion, the Second Circuit noted that, "as the Supreme Court recognized in *Zadvydas*, '[a] statute permitting indefinite detention of an alien would raise a serious constitutional problem.'" *Id.* (alteration in original) (quoting 533 U.S. at 690). It also observed that while the Supreme Court "upheld the facial constitutionality of detention under section 1226(c) without a bond hearing" in *Demore*, it "did so while emphasizing the apparent brevity of detentions pending removal[,]" citing statistics provided to the Court by the government that in eighty-five percent of cases, removal proceedings for § 1226(c) detainees were completed in an average of forty-seven days and a median of thirty days. *Black*, 103 F.4th at 143-44. "The Court's emphasis on this 'limited' period of detention strongly suggests a view that, while it found detention without an initial bond determination to be facially constitutional, 'indefinite' and 'potentially permanent' detention without a bond hearing would violate due process." *Id.* at 144 (quoting *Demore*, 538 U.S. at 529-31).

"Most judges who have squarely faced the question have applied the same logic to § 1225(b), holding that arriving aliens, like criminal aliens, cannot be detained for an unreasonably prolonged period of time without a bond hearing." *Bermudez Paiz v. Decker*, 2018 WL 6928794, at *10 (S.D.N.Y. Dec. 27, 2018); *see also Rincon v. Hyde*, 2025 WL 3122784, at *4 (D. Mass. Nov. 7, 2025) (directing bond hearing for asylum applicant detained following termination of his parole for three months pursuant to § 1225(b)); *Clerveaux v. Searls*, 397 F. Supp. 3d 299, 316 (W.D.N.Y. 2019) (holding that detaining a noncitizen under § 1225(b) for seventeen months without a bond hearing violated due process). This court similarly concludes that "[t]he Constitution does not permit the Executive to detain a noncitizen for an unreasonably prolonged period under

28

section [1225(b)] without a bond hearing; at some point, additional procedural requirements—like a bond hearing—become necessary." *Black*, 103 F.4th at 145; *see also Rashid*, 2025 WL 3210955, at *14-15 (ordering a bond hearing for a stowaway detained for fifteen months under § 1225(b)).

## 2.    Whether Mr. Walizada's Continued Detention Is Unreasonably Prolonged.

The Second Circuit has held that there is no "bright-line constitutional rule requiring a bond hearing . . . after any fixed period of detention . . . in the context of a Congressional mandate, in the immigration context, to detain." *Black*, 103 F.4th at 150. For challenges to prolonged detention under § 1226(c), courts in the Second Circuit proceed on a "case by case" basis under "the flexible *Mathews* [*v. Eldridge*, 424 U.S. 319 (1976)] framework[.]" *Id.* Claims of prolonged detention under § 1226(a) are similarly evaluated under the *Mathews* framework. *See Velasco Lopez*, 978 F.3d at 851. While the Second Circuit has not yet addressed the appropriate test to evaluate detention under § 1225(b), it has held that *Mathews* "applies when determining the adequacy of process in the context of civil immigration confinement." *Valdez v. Joyce*, 2025 WL 1707737, at *3 (S.D.N.Y. June 18, 2025) (citing *Velasco Lopez*, 978 F.3d at 851).

*Mathews'* three-part balancing test considers:

> (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Black*, 103 F.4th at 151 (quoting *Mathews*, 424 U.S. at 335).

### a.    The Private Interest.

Pursuant to the first *Mathews* factor, the private interest at stake here is "the most significant liberty interest there is—the interest in being free from imprisonment." *Velasco Lopez*, 978 F.3d at 851 (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004)); *see also Rashid*, 2025 WL 3210955, at *11 (same); *Lopez Benitez*, 795 F. Supp. 3d at 492 (same); *Clerveaux*, 397 F. Supp. 3d at 309 ("[Petitioner's] interest in his freedom pending

the conclusion of his removal proceedings deserves great 'weight and gravity.'") (quoting *Addington v. Texas*, 441 U.S. 418, 427 (1979)); *Mata Velasquez*, 794 F. Supp. 3d at 152 (same); *Rincon*, 2025 WL 3122784, at *9 ("The private interest at stake here is substantial, arguably the most important one there is."). A person's liberty cannot be abridged without "adequate procedural protection[][.]" *Zadvydas*, 533 U.S. at 690. "Case after case instructs us that in this country liberty is the norm and detention 'is the carefully limited exception.'" *Velasco Lopez*, 978 F.3d at 851 (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)).

As in *Velasco Lopez*, Mr. Walizada's deprivation is "not the result of a criminal adjudication." *Id.* He was detained by CBP at a port of entry for six days without access to legal counsel and then later detained at Northwest State Correctional Facility in Saint Albans, Vermont, a prison.[14] During his detention, he could "not maintain employment or see his family or friends or others outside normal visiting hours." *Id.* Like someone detained under §§ 1226(a) or (c), Mr. Walizada has "no administrative mechanism by which [he can] challenge[] his detention on the ground that it reached an unreasonable length." *Id.* at 852. "Thus, while mandatory detention without a bond hearing may be constitutional at the outset, the Second Circuit has held that, as the period of confinement increases, 'so do the required procedural protections no matter what level of due process may have been sufficient at the moment of initial detention.'" *Rashid*, 2025 WL 3210955, at *11 (quoting *Velasco Lopez*, 978 F.3d at 853).

In this case, Mr. Walizada has been detained for over three months without a bond hearing or any meaningful examination of whether his detention should continue in light of his assistance to the United States, employment record in this country, and lack of criminal history. Although longer detentions are more problematic,[15] courts have found

---

[14] Mr. Walizada was detained at Northwest State Correctional Facility at the time of filing his habeas petition and at the time of his October 7, 2025 hearing.

[15] *See, e.g.*, *Black v. Decker*, 103 F.4th 133, 153 (2d Cir. 2024) (finding detention under § 1225(b) for seven and twenty-one months without a bond hearing violated the Due Process Clause); *Rashid v. Trump*, 2025 WL 3210955, at *14 (D. Vt. Oct. 27, 2025) (fifteen months); *Banegas v. Decker*, 2021 WL 1852000, at *3 (S.D.N.Y. May 7, 2021) (nine months); *Cabral v.*

three months to be an unreasonably prolonged detention, especially when no bond hearing will be offered by an immigration court. *See Rincon*, 2025 WL 3122784, at \*10 (ordering a bond hearing to petitioner detained for three months pursuant to § 1225(b)). "[T]he court must also consider the probable length of [Mr. Walizada's] continued detention." *Rashid*, 2025 WL 3210955, at \*11. If Mr. Walizada's pending asylum application is any indication, he may wait years before his right to remain in the United States is resolved unless he is removed to the very country from which he seeks protection through his asylum application.

> Absent release on bond [or parole], detention lasts through the initial removal determination proceedings (which themselves can take months or years) and all inter-agency and federal court appeals, even where an individual has prevailed and the [g]overnment appeals. The longer the duration of incarceration, the greater the deprivation. Where the Supreme Court has upheld detention during the pendency of removal proceedings, it has been careful to emphasize the importance of the relatively short duration of detention.

*Velasco Lopez*, 978 F.3d at 852.

Mr. Walizada's pending asylum application does not render it more likely he will receive expeditious treatment because asylum proceedings are "an administrative process that can drag on for years due, in part, to a growing backlog of such cases." *Rincon*, 2025 WL 3122784, at \*1.[16] This is underscored where the Executive Branch has announced an

---

*Decker*, 331 F. Supp. 3d 255, 261 (S.D.N.Y. 2018) (seven months); *Clerveaux v. Searls*, 397 F. Supp. 3d 299, 316 (W.D.N.Y. 2019) (seventeen months); *Birch v. Decker*, 2018 WL 794618, at \*7 (S.D.N.Y. Feb. 7, 2018) (eleven months).

[16] "Individuals with an immigration court case who were ultimately granted relief such as asylum in FY 2024 waited more than 1,283 days on average for that outcome." *Asylum in the United States*, AM. IMMIGR. COUNCIL (May 9, 2025), https://www.americanimmigrationcouncil.org/factsheet/asylum-united-states/; *see also Immigration Court Quick Facts*, TRANSACTIONAL RECS. ACCESS CLEARINGHOUSE, https://tracreports.org/immigration/quickfacts/eoir.html (last visited Nov. 19, 2025) (showing that, as of August 2025, 2,271,857 immigrants were awaiting asylum hearings or decisions). Mr. Walizada himself filed his asylum application in November 2022 and attended his interview in December 2022, yet his asylum application remains pending over one thousand days later. Had the government not initially granted Mr. Walizada parole after inviting him to this country, he would have spent, to date, more than 1,500 days in detention.

intent to pause asylum proceedings of all applicants from Afghanistan through no fault of their own. The first *Mathews* factor therefore weighs heavily in favor of Mr. Walizada.

> ### b.    Risk of Erroneous Deprivation and Benefit of Additional Process.

With regard to the second *Mathews* factor, the risk of erroneous deprivation is high. "The only interest to be considered at this part of the *Mathews* analysis is that of the detained individual[]—not the government." *Black*, 103 F.4th at 152 (citing *Hamdi*, 542 U.S. at 530). Section 1225(b) detainees have almost no procedural protections available to them. A noncitizen detained under § 1225(b) has no statutory right to an individualized bond hearing to test the need for detention. The only procedural protection is DHS's discretion to grant the detainee parole. *See* 8 U.S.C. § 1182(d)(5)(A). "Other courts in this circuit to consider the constitutionality of indefinite detention under [S]ection 1225(b) have . . . discussed the reasons why parole is an inadequate protection." *Ahmed v. Decker*, 2017 WL 6049387, at \*7 (S.D.N.Y. Dec. 4, 2017).

Parole is determined not "by a neutral judicial arbiter, but rather by an executive officer of [DHS]" and is "a discretionary decision that is unreviewable by an immigration judge or federal court." *Id.* (internal quotation marks and citations omitted). Parole is further justified only by urgent humanitarian reasons or significant public benefits, which "is not coextensive with the standards for release governing a bond hearing[,]" in which an immigration judge considers whether a noncitizen is dangerous to the community or a flight risk. *Id.* (internal quotation marks and citation omitted).

The Executive's discretionary grant of parole "is no real test at all[]" to the propriety of detention by the Executive. *Rincon*, 2025 WL 3122784, at \*9. Even in the context of detention under § 1226(a), in which a noncitizen is entitled to an individualized bond hearing at which he bears the burden of proof, the Second Circuit concluded that "the procedures underpinning [his] lengthy incarceration markedly increased the risk of error." *Velasco Lopez*, 978 F.3d at 852. "Section [1225(b)] detainees receive even less procedural protection, and the risk of erroneous deprivation is correspondingly greater." *Black*, 103 F.4th at 152.

The risk of erroneous deprivation is also heightened for Mr. Walizada in particular. Mr. Walizada was invited to this country in recognition of either his support to American soldiers in Afghanistan or his vulnerability following the withdrawal of the United States from Afghanistan. Prior to being granted parole, Mr. Walizada underwent rigorous screening, including biometric and biographic screening. Despite this invitation from and extensive vetting by the United States government, the Federal Respondents now appear to deem Mr. Walizada unfit for parole.

Alternatively, the failure to extend Mr. Walizada's parole may be merely an administrative oversight. Mr. Walizada has an asylum application pending, and thus there is a real "possibility that the [p]etitioner will ultimately not be removed, which diminishes the ultimate purpose of detaining the [p]etitioner pending a final determination as to whether he is removable." *Sajous v. Decker*, 2018 WL 2357266, at *11 (S.D.N.Y. May 23, 2018). In other words, having been invited to the United States, lawfully employed here, and having his parole previously extended, Mr. Walizada now faces indefinite detention although he has committed no crime, was lawfully in the country, and merely made a wrong turn while at work. No rational decision-maker could conclude that indefinite detention with no right to a bond hearing is a legitimate governmental response to these facts.

Due to the high risk of erroneous deprivation, the court considers "the probable value, if any, of additional or substitute procedural safeguards[.]" *Mathews*, 424 U.S. at 335. Mr. Walizada has not received any kind of process to test the legitimacy of his detention. "An evidentiary hearing . . . at which the [g]overnment bears the burden of proof would undoubtedly provide greater protection against an erroneous deprivation of [Mr. Walizada's] liberty." *Rashid*, 2025 WL 3210955, at *13. The second *Mathews* factor therefore weighs heavily in favor of Mr. Walizada.

### c.    The Government's Interest.

The third *Mathews* factor considers "the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. In the

immigration context, the Second Circuit has recognized the government's "legitimate" and "well-established" interests in "ensuring the noncitizen's appearance at proceedings" and in "protecting the community from noncitizens" who are dangerous. *Black*, 103 F.4th at 153.

As in *Black*, "the additional procedural safeguards [the court] would allow . . . under *Mathews* do nothing to undercut those interests." *Id.* At a bond hearing, a judge would assess Mr. Walizada's flight risk and dangerousness on an individualized basis, "as [judges] routinely do for other noncitizen detainees." *Id.* at 154. "And while the government's legitimate interests justify a relatively short-term deprivation of liberty, the balance of interests shifts as the noncitizen's detention is prolonged without any particularized assessment of need." *Id.* (internal citation omitted). In this case, the Federal Respondents have not articulated any interest in the prolonged detention of Mr. Walizada; they do not claim that he is a flight risk or a danger to the community. They have simply asserted that they are entitled to detain him and so they have. "To require that the [g]overnment justify continued detention 'promotes the [g]overnment's interest—one we believe to be paramount—in minimizing the enormous impact of incarceration in cases where it serves no purpose.'" *Id.* (quoting *Velasco Lopez*, 978 F.3d at 854.)

As the Second Circuit has observed in both *Black* and *Velasco Lopez*, any "fiscal and administrative burdens" imposed by providing a bond hearing would likely be "minimal" and "outweighed by costs saved by reducing unnecessary detention" of noncitizens who are neither a flight risk nor a danger to the community. *Id.* at 154-55 (internal quotation marks omitted). "[T]he Department of Justice reported an average cost of detaining noncitizens, in 2019, of $88.19 per prisoner per day. Other estimates have placed the cost as high as $134 per day." *Black*, 103 F.4th at 154. "The administrative burden would therefore be negligible." *Rashid*, 2025 WL 3210955, at *14. The final *Mathews* factor therefore also weighs in Mr. Walizada's favor.

Finding all three *Mathews* factors weigh heavily in Mr. Walizada's favor, the court concludes that Mr. Walizada's detention has been and will continue to be unreasonably prolonged because it serves no legitimate governmental purpose and appears to be the

34

result of either administrative inadvertence or a misguided punishment for an individual who has enhanced rather than threatened national security.

### 3.    What Process Mr. Walizada Is Due.

In *Black*, finding that the noncitizens detained under § 1226(c) and its mandatory detention scheme were entitled to an individualized bond hearing because their prolonged detention violated due process, the Second Circuit also held that the government bore the burden of justifying the noncitizen's "continued detention by clear and convincing evidence." *Black*, 103 F.4th at 155.

> Where the government seeks to continue depriving a person of their liberty—especially when a district court has already found that deprivation to be unconstitutionally prolonged—we must require the government to bear the burden of proving the need for continued detention. Otherwise, "the risk of an erroneous deprivation" of a detainee's liberty interest would remain unacceptably high.

*Id.* (citing *Mathews*, 424 U.S. at 335). The Second Circuit reasoned that the government should bear the burden because: (1) noncitizens often lack access to legal counsel in removal proceedings and are therefore at a disadvantage; (2) detained noncitizens may encounter difficulties in gathering evidence and communicating with legal counsel even when they are represented, "making preparation of their cases more difficult while in detention"; and (3) requiring detainees to prove a negative (not a flight risk, not a danger) "after the government has enjoyed a presumption that detention is necessary . . . presents too great a risk of an erroneous deprivation of liberty after a detention that has already been unreasonably prolonged." *Id.* at 156. For these reasons, the Second Circuit adopted a clear and convincing evidence standard because "the Supreme Court has consistently used this evidentiary standard for continued detention." *Id.* at 157. "This reasoning applies with equal force to noncitizens detained under § 1225(b)[.]" *Rashid*, 2025 WL 3210955, at *14.

In *Black*, the Second Circuit directed an immigration judge to consider "both [Mr.] Black's ability to pay and any alternatives to detention." *Black*, 103 F.4th at 155. The court was guided by its concern for "[t]he 'risk of an erroneous deprivation' of the noncitizen's liberty if alternatives to detention and ability to pay are not considered at the

ordered bond hearing[.]" *Id.* at 158 (citing *Mathews*, 424 U.S. at 335). The Second
Circuit affirmed that a judge retains broad discretion in setting bond and "is free to give
as much or as little weight to [a noncitizen's ability to pay and alternatives to detention]
as appropriate, as long as *some* weight is given, and as long as the decision is
reasonable." *Id.* at 159 (emphasis in original) (internal quotation marks and citation
omitted).

On October 16, 2025, Mr. Walizada was denied bond by an IJ who concluded that
he "is statutorily ineligible for IJ custody redetermination[,]" presumably under the BIA's
decision in *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (BIA 2025). (Doc. 17-1 at 2.)
The IJ therefore did not consider whether he was a flight risk or a danger to the
community, or whether his detention violated the Due Process Clause. IJs are generally
not authorized to consider constitutional claims. *See, e.g.*, *Flores-Powell v. Chadbourne*,
677 F. Supp. 2d 455, 463 (D. Mass. 2010) ("[T]he BIA[] lack[s] . . . authority to
adjudicate constitutional questions[.]"); *Ashley v. Ridge*, 288 F. Supp. 2d 662, 667 (D.N.J.
2003) ("The Immigration Court and [BIA] are courts of limited jurisdiction that cannot
consider constitutional claims."). For this reason, the court finds it would be futile to
order another bond hearing before an IJ. The court therefore GRANTS Mr. Walizada's
Petition to the extent it seeks a review of his detention under the Due Process Clause of
the Fifth Amendment and will set this matter for an individualized bond hearing at which
the Federal Respondents shall bear the burden of proving by clear and convincing
evidence that Mr. Walizada poses a risk of flight or a danger to the community.

### E.    Whether Mr. Walizada's Continued Detention Violates the Fourth Amendment.

Mr. Walizada claims that his detention "without a legitimate and individualized
finding of necessity" violates his Fourth Amendment right to be free from unreasonable
seizures. (Doc. 17 at 5-6.) He contends that "[t]he Fourth Amendment protects against
arbitrary and indefinite detention by requiring that any deprivation of liberty be justified."
*Id.* at 6. The Federal Respondents respond that Mr. Walizada's allegations do not support

36

a Fourth Amendment claim and that, even if Mr. Walizada had stated a claim under the
Fourth Amendment, habeas is not an appropriate remedy for an unreasonable seizure.

The Second Circuit has analyzed claims of prolonged detention under the Due
Process Clause, not the Fourth Amendment. *See Black*, 103 F.4th at 143; *Velasco Lopez*,
978 F.3d at 850; *Lora v. Shanahan*, 804 F.3d 601, 613-14 (2d Cir. 2015); *Michalski v.
Decker*, 279 F. Supp. 3d 487, 496, 496 n.6 (S.D.N.Y. 2018) (although the Fourth
Amendment might apply to "initial arrest and detention pending removal proceedings[,]"
"[c]hallenges to the <u>length</u> of civil immigration detention—including under 8 U.S.C.
§§ 1225(b), 1226(a), and 1226(c)—have typically been on due process grounds")
(emphasis in original).

Mr. Walizada has not cited, and the court has not found, any authority for a Fourth
Amendment claim based on prolonged immigration detention. The court therefore
DENIES Mr. Walizada's Petition to the extent it seeks relief under the Fourth
Amendment.

## CONCLUSION

For the foregoing reasons, Petitioner's petition for writ of habeas corpus is
GRANTED IN PART and DENIED IN PART. (Doc. 1.) The court will set this matter for
an individualized bond hearing.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this __11th__ day of December, 2025.

Christina Reiss, Chief Judge
United States District Court